**UNITED STATES of America,
Plaintiff,**

v.

**CHAS. PFIZER & CO., Inc., John E. Mc-
Keen, American Cyanamid Company,
Wilbur G. Malcolm, Bristol-Myers Com-
pany, Frederic N. Schwartz, Defendants.**

United States District Court
S. D. New York.

Sept. 9, 1965.

See also D.C., 217 F.Supp. 199.

Harry G. Sklarsky, Herman G. Gel-
fand, Gerald R. Dicker, Stanley W.
Nathanson, John L. Butler, Attys., Dept.
of Justice, New York City, for plaintiff;
Donald F. Turner, John J. Galgay, John
D. Swartz, Attys., Dept. of Justice, of
counsel.

Dewey, Ballantine, Bushby, Palmer &
Wood, New York City, for defendant
John E. McKeen; John E. F. Wood,

Charles E. Stewart, Jr., Judson A. Parsons, Jr., New York City, of counsel.

Donovan Leisure Newton & Irvine, New York City, for defendant Wilbur G. Malcolm; Ralstone R. Irvine, Walter R. Mansfield, Richard Y. Holcomb, New York City, of counsel.

Winthrop, Stimson, Putnam & Roberts, New York City, for defendant Frederic N. Schwartz; Merrell E. Clark, Jr., Terence H. Benbow, James T. Boorsch, New York City, of counsel.

RYAN, Chief Judge.

Defendants, John E. McKeen, Wilbur G. Malcolm and Frederic N. Schwartz move to dismiss the indictment as to them on the ground that they are immune from further prosecution pursuant to the anti-trust immunity act of February 25, 1903, 32 Stat. 903–904, as amended, 15 U.S.C. §§ 32, 33.

McKeen is president and chairman of the board of Chas. Pfizer & Co., Inc.; Malcolm has served as chairman of the board of directors, vice-president and president of the American Cyanamid Company; Schwartz has been president of Bristol-Myers Company and of Bristol Laboratories, Inc., a wholly owned subsidiary of Bristol-Myers.

On August 17, 1961, movants and their companies were indicted in the Southern District of New York for violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. Defendants are charged with conspiracy to restrain trade and commerce, conspiracy to monopolize trade and commerce, and monopolization of trade and commerce in the manufacture, distribution and sale of broad spectrum antibiotics and broad spectrum antibiotic products. Olin Mathieson Chemical Corporation (hereinafter referred to as "Squibb"), the Upjohn Company, and various other individuals were named as co-conspirators.

The alleged conspiracy concerned the issuance of a patent to Pfizer for the broad spectrum antibiotic tetracycline. The indictment alleges that Pfizer, Cyanamid, and Bristol misled the Patent Office so as to enable Pfizer to obtain this patent, and that subsequently, defendants and co-conspirators conspired and effectuated through licensing agreements a system whereby the manufacture and sale of tetracycline products and bulk tetracycline were confined to defendants and co-conspirators and these products were sold at substantially identical and non-competitive prices by the companies involved. It is charged also that the alleged conspiracy included price fixing of broad spectrum antibiotics.

Subsequent to the return of this indictment, movants were subpoenaed to appear before a grand jury impanelled in the District of Columbia and testified under subpoena before that jury in May and June, 1962. It is this testimony which movants rely upon as the basis of their contention that they now are immune from further prosecution under the indictment returned in this district.[1]

Defendants have been given access to their testimony before the Grand Jury, and we have a transcript of this testimony.

Prior to the May-June 1962 hearings of the District of Columbia Grand Jury, there was a Federal Trade Commission proceeding and a Senate Subcommittee investigation dealing with alleged anti-trust violations in the production and marketing of antibiotics. When interpreting the relevancy of the grand jury testimony of these defendants to the instant indictment, the background and facts of this industry's activity as revealed in this Federal Trade Commission

---

1. 15 U.S.C. § 32 provides that:
 "No person shall be prosecuted * * * on account of any transaction, matter, or thing concerning which he may testify * * * in any proceeding, suit, or prosecution under sections 1–7 of this title * * *"

15 U.S.C. § 33 provides that:
 "Under the immunity provisions in section 32 of this title, immunity shall extend only to a natural person who, in obedience to a subpoena, gives testimony under oath * * *"

proceeding and Senate investigation are important.

On July 28, 1958, the Federal Trade Commission issued a complaint against the five drug companies named herein as defendants and co-conspirators charging them with unfair methods of competition, and acts and practices in commerce in violation of section 5 of the Federal Trade Commission Act, 15 U.S.C. § 41 et seq. The complaint alleged that Pfizer unilaterally attempted to monopolize the antibiotic industry, attempted to and did monopolize the tetracycline industry, by fraud and misrepresentation caused a patent on tetracycline to be issued by the United States Patent Office, and issued invalid licenses under said patent. The complaint further alleged that all defendants by conspiracy fixed the prices of tetracycline, chlortetracycline and oxytetracycline; foreclosed and prevented competition in tetracycline and chlortetracycline by licenses and cross-licenses; attempted to and did monopolize tetracycline and that Pfizer, Bristol and Cyanamid (the instant defendant companies) withheld material information from the Patent Office as a result of which Pfizer was enabled to secure the tetracycline patent; and that Pfizer issued and Cyanamid, Bristol, Squibb and Upjohn accepted licenses under the tetracycline patent with knowledge of such withholding and misrepresentation, and, independently thereof, with knowledge that the invention was unpatentable. Hearings were held at various times from January 5, 1959 to February 4, 1960 before a Hearing Examiner. On October 30, 1961 the Examiner submitted an initial decision in which he found that the charges had not been sustained by the evidence and ordered the complaint dismissed. An administrative appeal was taken and on August 8, 1963, the Commission issued an opinion vacating the initial decision, making its own findings of facts and conclusions of law. The Commission found that Pfizer and Cyanamid did make certain misrepresentations and withheld other information in connection with Pfizer's application for a patent on tetracycline, which prevented the patent examiner from making an accurate appraisal of the patentability of tetracyclines; that the conspiracy charge before the patent office between Pfizer and Cyanamid was "not proven", that Bristol, Squibb and Upjohn did not engage in any unfair methods of competition before the Patent Office; and that Pfizer, Cyanamid, Bristol, Squibb and Upjohn engaged in a conspiracy to fix, maintain and stabilize the price of tetracycline.

The Commission made the following factual findings:

The two principal antibiotics, prior to tetracycline, were chlortetracycline and oxytetracycline. Cyanamid and Pfizer owned the patents on chlortetracycline and oxytetracycline, respectively, and sold this product under the brand names of aureomycin and terramycin. Until the discovery of tetracycline, neither of these companies had granted a license under its patent or had sold its product in bulk to any other drug producer or distributor. The prices of these two antibiotics had been virtually identical since 1951, and in 1953, Cyanamid and Pfizer accounted for over 90% of the total volume of sales of broad spectrum antibiotics.

During the Autumn of 1952 and the greater part of 1953, six applications for a patent on tetracycline were filed. Two of these applications claimed the process of producing tetracycline by the deschlorination of chlortetracycline (aureomycin), while four applications claimed a production process of direct fermentation. By the end of 1953, Cyanamid had three tetracycline applications pending —The Boothe-Morton application, for the deschlorination process, and the Martin-Bohonos and Minieri (purchased from the Heyden Corporation) for a fermentation process; Pfizer had two applications pending—the Conover application, for the deschlorination process and the Tanner application, for a fermentation process; and Bristol had one application pending, the Heinemann application, for a fermentation process.

Cyanamid had already determined by the autumn of 1953 that tetracycline possessed many properties which in some specific conditions were superior to and more effective than aureomycin. Pfizer knew of this determination. Both Cyanamid and Pfizer knew that tetracycline, if produced and sold commercially, would be fully competitive with aureomycin and terramycin. They both knew or had reason to believe that the value of their respective patents and their dominant positions in the broad spectrum antibiotic market would be impaired by the unrestricted production and sale of tetracycline. Moreover, they knew or had reason to believe that if tetracycline could be sold by other firms in free and open competition, the price of this product and other broad spectrum antibiotics would be forced downward as the price of penicillin had been during and subsequent to World War II.

On December 28, 1953, the Patent Examiner declared interference on tetracycline and the deschlorination process between Pfizer's "Conover" application filed on October 23, 1952, and Cyanamid's "Boothe-Morton" application filed on March 16, 1953. Pfizer and Cyanamid agreed to cross-license all patents covering tetracycline. Cyanamid licensed Pfizer to produce aureomycin for the manufacture of tetracycline and Cyanamid conceded priority to Pfizer. The interference was terminated.

Shortly after, on March 2, 1954, the Patent Examiner declared a second interference, this time on tetracycline hydrochloride, between Cyanamid's "Minieri" application filed on September 28, 1953, Bristol's "Heinemann" application filed on October 19, 1953 and Pfizer's "Conover" application.

In January 1954, Bristol had claimed tetracycline hydrochloride, and had persuaded the Patent Examiner that tetracycline hydrochloride was patentably distinguishable from tetracycline. On October 14, 1954, it was ruled that tetracycline hydrochloride was not patentably distinct from tetracycline and that, in any case, tetracycline was unpatentable as to all parties, because tetracycline was a by-product in the production of chlortetracycline (aureomycin).

Despite the fact that Pfizer scientists had previously found that tetracycline was present in an aureomycin broth, representatives of Pfizer argued to the patent examiner that there was no reasonable basis for his speculation as to coproduction of tetracycline in the prior art aureomycin processes. The patent examiner informed these representatives that he would withdraw his rejection of Pfizer's tetracycline product claims if they could demonstrate that tetracycline could not be recovered from broths produced in accordance with the patent disclosures for the aureomycin patents. Pfizer scientists conducted these tests and Pfizer representatives stated in test affidavits that tetracycline could not be recovered from these broths in a clearly identifiable form. On the assurances given in these affidavits, a patent on tetracycline was issued to Pfizer. The FTC found, however, that the Pfizer representatives did not disclose to the patent examiner that their scientists had found that the particular broth medium chosen by the Examiner for the test was so poor in antibiotic potency that it had been classified as containing no aureomycin or tetracycline, but that aureomycin patents also disclosed in the other media contained as much as 5% tetracycline; and that in conducting the test, the Pfizer scientists varied the pH level from the range specified in the aureomycin patents to give the best results, and did not employ the best procedures for recovering tetracycline from the antibiotic broth. These alleged statements and the alleged suppression of this information were found by the FTC to have been proven and were the basis for the FTC's conclusion that Pfizer had made false and misleading statements in obtaining the tetracycline patent.

The FTC also found that various statements denying concomitant production were made by a representative of Cyanamid to the Examiner in connection with Cyanamid's "Boothe-Morton" and "Min-

ieri" applications. Cyanamid, as early as December 1953, had evidence that tetracycline was present in its aureomycin products and it was found that this information was not disclosed to the Patent Examiner. As to Bristol, the FTC found that it never made false statements denying coproduction, but that it did possess information concerning inherent production.

It appears that on the same day that Pfizer received a patent on tetracycline, it brought infringement suits against Bristol, Squibb and Upjohn, seeking damages and a restraining order preventing them from marketing tetracycline. (Squibb and Upjohn had been buying tetracycline from Bristol in bulk and selling it in dosage form to the drug trade for several months.)

Bristol, Squibb and Upjohn also filed actions in the Southern District of New York seeking declaratory judgments that they were not infringing any valid claim of Pfizer's patent. In their answers to the Pfizer complaint they claimed the "Conover" patent was invalid because, among other things, it had been allowed by the Patent Office under a mistake of fact induced by Pfizer and that the claims of the patent were unenforceable because of Pfizer's "unclean hands" arising from its misrepresentations of fact to the Patent Office in its prosecution of the application on which the patent was obtained. Throughout most of 1955, Bristol, Squibb and Upjohn took numerous depositions of Pfizer's officials and technical workers and subpoenaed documents from Pfizer. The suits were eventually settled with Bristol receiving a license to manufacture and sell tetracycline. Squibb and Upjohn received licenses to sell tetracycline to the drug trade. The licensees were required to pay Pfizer a royalty of 3½ percent of net sales.

The FTC's findings of fact also separately dealt with the pricing practices charge. The Commission found that part of the licensing agreement between defendants included an agreement to fix and maintain prices.

Prior to the licensing agreement, Bristol had adopted the tetracycline price schedules of Cyanamid and Pfizer, and Squibb and Upjohn also adhered to the same price level when they entered the market. These agreements extended to sales in the prescription, the public supported hospital and the non-profit private hospital markets. It was found by the FTC that the defendants had agreed to submit identical bids to the Veterans Administration and that the devices used to forestall effective price competition included the adoption of uniform package sizes, resale price maintenance, avoidance of price competition among different dosage forms, and refusal to give quantity discounts.

The Commission inferred that there was a conspiracy to fix prices from evidence of conversations and of meetings between officers of the defendant companies.

A further investigation into the antibiotics industry was at hearings before a Subcommittee on Antitrust and Monopoly of the Senate Committee on The Judiciary in May-September 1960. This Subcommittee's investigation was directed to the price structure of antibiotics and whether it exhibited rigidity and identical pricing between different companies. In an effort to ascertain if these prices were competitive, inquiries were made concerning the companies' profits (including capital structure, stock prices, dividends, return on capital, methods used to finance expansion) and expenses in the manufacture and distribution of antibiotics (including production, general administration, research, officers' salaries and advertising and promotional costs). Comparisons were also made between prices charged by American drug companies abroad and in the United States.

Inquiry was also directed toward possible monopolies and monopolistic tendencies in the industry. Interrogation covered percentage control of various products, and licensing arrangements between different companies. One aspect of inquiry concerned the use of mislead-

ing advertising and promotion in order to gain a larger share of a particular market.

It disclosed that huge sums were spent by drug companies on direct mailings to doctors of reprints and other information and these mailings were said to cause doctors to prescribe antibiotics under brand names rather than generic names.

The relationship between the companies' promotional activities was stated by Senator Kefauver at the Senate Committee hearing of May 17, 1960:

> "During the course of these administered price hearings concerning the ethical drug industry, it has become increasingly clear that the various forms of promotion of ethical drug products have a material effect on the share of the market that a drug manufacturer obtains.
>
> The record reveals that drug products are promoted in many ways— by personal calls upon doctors by detail men; by direct mail; and by advertisements in medical journals. In many cases the basis of the promotion is an article concerning the drug which has been published in a medical journal. Sometimes reprints of the articles are used; at other times the articles are merely cited to validate the promotional material."

During this investigation of promotional activities, the Subcommittee looked into the activities of Henry Welch, who during the late 1950's was head of the Antibiotic Division of the Food and Drug Administration. It appeared that he, at the same time, had a financial interest in several medical journals which relied for income upon the sale of advertising and reprints to drug manufacturers. [As head of the Antibiotic Division, Welch was instrumental in certifying new antibiotics. The Subcommittee had been informed by some smaller companies "that companies which have not advertised extensively in these magazines have a very difficult time getting

their product approved by the Antibiotics Division" (Hearing Record p. 11905).] The record shows that Welch was Editor-in-Chief of two journals: "Antibiotics & Chemotherapy" and "Antibiotic Medicine & Clinical Therapy" —both published by MD Publications, Inc., which was owned by Dr. Felix Marti-Ibanez. Welch and Dr. Ibanez owned jointly another company "Medical Encyclopedia, Inc." which published the Antibiotic Annual and other books.

At the Senate Subcommittee hearings it was disclosed that in exchange for Welch's duties as Editor-in-Chief, "MD Publications" agreed to pay him seven and one-half percent net on advertising income from both journals, fifty percent of net income from sale of reprints from both journals, and twenty-five percent of net income from either journal, when extra pages were added. It was also revealed that in the years 1953–1959 the defendants and co-conspirators named in the indictment before us paid the following amounts to "MD Publications" for advertising, reprints and extra pages: Pfizer, $256,711; Lederle (Cyanamid), $168,495; Bristol, $62,540; Upjohn, $89,055; Squibb, $47,035. The total payments to Welch from "MD Publications" and from "Medical Encyclopedia, Inc." (1953-March 1960) amounted to $287,142.40 (Hearing Record pp. 11,947 and 11,948).

With this as a background, the Subcommittee focused on what it took to be Welch's efforts in his official capacity to promote the commercial sale of the product of a private company. These efforts took the form of encouraging scientific papers which gave credence to the advertising and promotional claims of certain drug manufacturers for particular products and therefore would tend to influence physicians. As previously noted, Welch served as Editor of the "Antibiotics Annual", which consisted of papers given before a symposium jointly sponsored until 1958 by the Food and Drug Administration and Medical Encyclopedia, Inc. Welch selected the pa-

pers to be read at the symposia, and then sold reprints to the drug industry to be used in promotional material sent to doctors.

The Subcommittee also discussed the relationship between Welch and the Pfizer promotional campaign for Sigmamycin. Sigmamycin is a combination of two antibiotics: tetracycline and oleandomycin. Its most desirable feature, according to Pfizer's advertising campaign, was the fact that it was to be "synergistic". (A product containing two drugs is said to be "synergistic" if the combined therapeutic effect of the two drugs taken together is greater than the sum of the effects of the drugs taken separately.)

In the summer and autumn of 1956, Pfizer was planning to place sigmamycin on the market, and it was decided that the theme for the promotional campaign for this product would be "synergistic" activity. The key phrase in this campaign was the description of sigmamycin as "A Third Era in Antibiotic Therapy". Welch was scheduled to give the opening address at the Fourth Annual Antibiotics Symposium scheduled for October 1956 and he submitted a draft of his remarks to Pfizer, whose employees made several changes. One of the changes made was the introduction into this speech of the phrase "Third Era of Antibiotic Therapy". At the opening of the Symposium, Welch stated:

"It is quite possible we are now in a third era of antibiotic therapy; * * the third being an era of combined therapy where combinations of chemotherapeutic agents, particularly synergistic ones, will be customarily used."

Welch's speech, thus prepared, was used in an international press release sent out by a Pfizer public relations man. Pfizer purchased hundreds of thousands of reprints, quoting Welch from "Medical Encyclopedia" and "MD Publications". Many of these reprints were sent to physicians.

A further, or third phase of governmental activity concerning the ethical drug industry resulted in the return of the indictment on August 17, 1961, now before us.

After a recital of the background of the discovery of tetracycline and patent applications on this product, the first count of the indictment charges that, beginning in November 1953, in restraint of trade, the defendants and co-conspirators combined and conspired to the end that the manufacture of tetracycline, the sale of tetracycline products, and the sale of bulk tetracycline be confined to some or all of them, and that the sale of broad spectrum antibiotic products by them be at substantially identical and non-competitive prices. To effectuate this combination and conspiracy, it was charged that defendants used licenses to limit the use of aureomycin and the sale of tetracycline and cooperated to enable Pfizer to obtain the tetracycline patent; that Bristol sold bulk tetracycline only to Upjohn and Squibb and entered into agreements with these companies to this effect; that Pfizer and Cyanamid maintained substantially identical, non-competitive and unreasonably high prices on terramycin and aureomycin products, respectively; and that defendants and co-conspirators introduced their tetracycline products in dosage forms and customer classifications substantially identical with those of the terramycin and aureomycin products in effect as of November 1953, and have continued to use such substantially identical forms and classifications to date.

Count 2 of the indictment charges that beginning in November, 1953, the defendants and the co-conspirators engaged in an unlawful combination and conspiracy to monopolize the manufacture, distribution and sale of broad spectrum antibiotics and broad spectrum antibiotic products. It is charged that the terms of this combination and conspiracy and the means used to effectuate it were the same as those alleged in Count 1.

Count 3 charges that beginning in November, 1953, defendants monopolized the manufacture, distribution and sale of broad spectrum antibiotics and broad spectrum antibiotic products and by the same means as alleged in the first count.

After the return of the indictment, and on October 17, 1962, pursuant to order of this court, the United States served a bill of particulars which we will later consider.

There is still a fourth aspect of the government's investigation of the antibiotics industry in the proceedings of the District of Columbia Grand Jury during the spring of 1962. This grand jury was impanelled on January 15, 1962; evidence was presented to it by an attorney assigned to the Criminal Division, Department of Justice.[2]

It is undisputed that the scope of this grand jury investigation included the examination of the relationship between Henry Welch and certain ethical drug manufacturers.

Grand Jury subpoenas were served on defendants McKeen, Malcolm and Schwartz to appear and testify.[3]

2. The departmental letter of authority addressed to the attorney assigned recited in part that:

"The Department is informed that various persons, companies, corporations and firms to the Department unknown have violated in the District of Columbia, the Eastern District of New York and in other judicial districts the bribery, conflict of interest, false statements and conspiracy statutes (18 U. S.C. 201, 202, 281, 434, 1001 and 371) by promising or offering money or things of value to an officer, employee or person acting for or on behalf of the United States; by asking or receiving money or things of value while serving as an officer or employee or person acting for or on behalf of the United States in an official capacity; by receiving or agreeing to receive compensation for services rendered in relation to a matter in which the United States is directly or indirectly interested while serving as an officer or employee of the United States; by acting as an officer, agent or member of a business entity interested in the pecuniary profits thereof while serving as an officer or agent of the United States; by making false statements in a matter within the jurisdiction of a department or agency of the United States and by conspiring to commit such offenses and to deprive the United States of the honest and faithful service of its employees and have violated other criminal laws of the United States and have conspired so to do in violation of Section 371 of Title 18 of the United States Code. * * * "

3. Among the documents that they and their companies were ordered to produce before the grand jury were the following: For the years 1950 through 1960:
All correspondence and memoranda and all books and records with or about or on behalf of:
Dr. Henry Welch,
Dr. Felix Marti-Ibanez
MD Publications Inc.
Medical Encyclopedia, Inc..
McAdams International Inc. and William Douglas McAdams, Inc. as they pertain to Dr. Henry Welch, Dr. Felix Marti-Ibanez, MD Publications, Inc., Medical Encyclopedia, Inc. and Washington Institute of Medicine, Inc.
Any drug or Antibiotic patent rights, domestic or foreign, which were purchased from or offered for sale by Dr. Henry Welch.
Any advertising and any scientific article published in any publications of Medical Encyclopedia, Inc. and of MD Publications, Inc.
Any purchase of reprints of articles published in any publication of Medical Encyclopedia, Inc., and in certain publications of MD Publications, Inc.
Symposia concerning antibiotics which were convened annually in Washington, D. C. under the joint sponsorship of the Department of Health, Education and Welfare and MD Publications, Inc., or under the sole sponsorship of MD Publications, Inc.
For the years 1956 through 1960:
All correspondence and memoranda to, from, within or concerning:
1) Advertising Sigmamycin (Signemycin).
2) The Medical Department pertaining to Sigmamycin (Signemycin) ex-

Subsequent directions were issued for the production of correspondence, memoranda, and other documents relating to the distribution of certain reprints of articles published in journals of MD Publications and Medical Encyclopedia and of certain books and supplements published by these companies. Some of the reprints and books mentioned were: "An Appraisal of Tetracycline", "Use of Tetracycline Phosphate Complex, etc.", "Tetracycline Concentrations in Blood Serum Bile", "Tetracycline", "Tetracycline in the Treatment of Human Brucellosis II", "Tetracycline, A New Antibiotic", "The Pharmacology of Tetracycline," etc.

The Attorney of the Criminal Division, who impanelled the District of Columbia Grand Jury has filed an affidavit in which he states that "no witness was called and no documents were subpoenaed —to elicit information relating to violations or possible violations of the antitrust laws." According to this affidavit, the Grand Jury was convened only to investigate the "receipt of monies by Henry Welch that indirectly came from the drug firms" in possible violation of the bribery, conflict of interest, false statements and general conspiracy statutes. The monies said to be received by Welch come from and were a portion of what the drug firms paid for advertising and reprints to publishing companies in which Welch had an interest. The affiant also states that during the course of the grand jury investigation he did not consult with any persons in the Anti-Trust Division, and that to the best of his knowledge there was no communication between the two divisions concerning the District of Columbia grand jury proceedings.

The Antitrust Division has also submitted an affidavit in which it is stated that prior to October 16, 1964 the trial staff assigned to the prosecution of the instant indictment was unaware of the existence of the grand jury proceedings in the District of Columbia, and that no member of this staff had any contact with the Criminal Division concerning any aspect of that grand jury.

During the course of the grand jury hearings, the government attorney assigned made statements to witnesses before the Grand Jury disclaiming any interest in violation of the antitrust laws. The Grand Jury transcript records these statements by him:

"Mr. McKeen, this Grand Jury has not been investigating anything connected with any antitrust suit concerning you or anybody else and nothing has transpired before this Grand Jury that touches on any antitrust suit insofar as we know" (p. 4 McKeen).

"Don't go into those antitrust matters, if that's what you're getting into" (p. 17 McKeen).

We find on the record before us, however, that the defendants did give testimony before the Grand Jury concerning transactions, matters and things for and on account of which they are being prosecuted in this action.

Defendants were not obliged to claim their privilege against self-incrimination in order to be protected by the Sherman Act immunity statute [United States v. Monia, 317 U.S. 424, 63 S.Ct. 409, 87 L.Ed. 376 (1942)]. Likewise, the fact that they were reminded about their Fifth Amendment rights does not deprive them of the

---

cluding the technical laboratory data but including those reports which interpret such data.

For the years 1956 through 1960 copies of:

1) All direct mail advertising matter.
2) All package inserts, and
3) All advertising material submitted for printing in

a. The Journal of the American Medical Association.
b. Any publication of Medical Encyclopedia, Inc., and
c. The journals "Antibiotics and Chemotherapy," "Antibiotic Medicine" and "Antibiotic Medicine and Clinical Therapy," as they pertain to Sigmamycin (Signemycin).

statute's protection. The immunity conferred by a statute must protect a witness to the same extent that the Fifth Amendment protects him [Brown v. Walker, 161 U.S. 591, 16 S.Ct. 644, 40 L.Ed. 819 (1896); Hale v. Henkel, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652 (1906); Heike v. United States, 227 U.S. 131, 33 S.Ct. 226, 57 L.Ed. 450].

Recent decisions have commented on the broad protection afforded by the Fifth Amendment. In Hoffman v. United States, 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118 (1951), the Supreme Court stated:

"The privilege afforded not only extends to answers that would in themselves support a conviction under a federal criminal statute but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime."

In Blau v. United States, 340 U.S. 159, 71 S.Ct. 223, 95 L.Ed. 170 (1950), a witness refused to answer the questions,

"* * * do you know the names of the State officers of the Communist Party of Colorado? * * * Do you know the names of any persons who might now have the books and records of the Communist Party of Colorado?" (p. 160, 71 S.Ct. p. 223).

The Court held that the witness was not required to answer these questions because

"Answers to the questions asked by the grand jury would have furnished a link in the chain of evidence needed in a prosecution of petitioner for violation of (or conspiracy to violate) the Smith Act" (p. 161, 71 S.Ct. p. 224).

In Emspak v. United States, 349 U.S. 190, 75 S.Ct. 687, 99 L.Ed. 997 (1955), an officer of a labor union was summoned to testify before a congressional committee investigating alleged Communist infiltration of labor unions in defense plants. He refused to answer some of the questions which asked in substance that he state whether or not he was acquainted with certain named individuals and whether or not these individuals had ever held official positions in the union. The Court held that the witness was privileged not to answer these questions, writing that

"Under these circumstances, it seems clear that answers to the 58 questions concerning petitioner's associations 'might be dangerous because injurious disclosure could result.' To reveal knowledge about the named individuals—all of them having been previously charged with Communist affiliations—could well have furnished 'a link in the chain' of evidence needed to prosecute petitioner for a federal crime, ranging from conspiracy to violate the Smith Act * * *" (pp. 200–201, 75 S. Ct. p. 693).

Following this statement, the Court took notice of a list of lower court cases treating this subject.

In Smith v. United States, 337 U.S. 137, 69 S.Ct. 1000, 93 L.Ed. 1264 (1949) the petitioner claimed that he was immune from prosecution because he was entitled to the immunity protection of the Compulsory Testimony Act ("* * * no person shall be prosecuted * * * for or on account of any transaction, matter or thing, concerning which he may testify, or produce evidence, documentary or otherwise * * *") by reason of testimony he had given before the Office of Price Administration. The Court held that petitioner was entitled to the claimed immunity from prosecution and wrote:

"The indictment was for conspiracy to sell finished piece goods in excess of prices fixed under the Price Control Act. * * * the indictment also charged as a part of the conspiracy a plan through false invoices to secure payments for the goods by checks to fictitious persons which the conspirators cashed. * * * Petitioner testified as to the business organization of Daisart, its acquisition of materials through

the priorities furnished by Metals Disintegrating from named firms on their invoices and its payment for these *goods* at all times by check. Daisart's bank was named. \* \* \* *Certainly many of these disclosures furnished leads that could have uncovered evidence of the unlawful conspiracy charged in the indictment.* Petitioner testified concerning transactions, matters and things substantially connected with parts of the conspiracy \* \* \*" (pp. 152–153, 69 S.Ct. p. 1008). (Italics ours.)

■ Applying these tests to the testimony of the three defendants before the District of Columbia grand jury, we find that in all three instances, testimony was given by them from which, along with other evidence, defendants' guilt could be inferred and which would furnish leads that could uncover further evidence of the unlawful conspiracy charged in the indictment pending in the Southern District of New York.

Defendants are charged with a combination and conspiracy (in violation of Sections 1 and 2 of the Sherman Act), which has consisted of a "continuing agreement and concert of action" to confine the manufacture and sale of tetracycline and its products, and to fix the prices of broad spectrum antibiotics. To establish a factual background from which a trial jury may infer a conspiracy to fix prices, it will be necessary to probe into, investigate and present evidence of market factors, which would support a jury determination as to whether prices were the result of the charged conspiracy or of normal competitive forces. How antibiotics are marketed and the importance of advertising and promotion in developing preferences among physicians for particular products and brands are most significant in this area of proof—particularly in this circumstantial evidence case.

The government, in its Bill of Particulars (paragraph "4"), states that this continuing agreement and concert of action is "implied", and in paragraph "6", identifies the "documents" and "acts, occurrences and other circumstances which are claimed to support the inference of agreement." Paragraph "7" of the Bill of Particulars states, however, that "the Government does not claim that any of the written agreements or any combination thereof which will be offered in evidence are unlawful without reference to other facts." It appears, therefore, that the Government recognized that the overall economic context of the broad spectrum antibiotic industry, including marketing and advertising practices, must be referred to when interpreting the written agreements listed in the bill of particulars.

We have noted that during the Senate Subcommittee's investigation of the industry, Senator Kefauver stated that the forms of promotion of ethical drug products have a material effect on the share of the market that a drug manufacturer obtains. The Senator's astute observation has ample support in the records now before us. It is plain that marketing and advertising practices could be proved at trial to interpret the acts and other circumstances listed in the bill of particulars. All three individual defendants testified to promotional practices.

Defendant McKeen, the president of Pfizer, testified about a proposal by Welch concerning the purchase of advertising in a magazine of MD Publications in which the advertising rate, type of advertising, and distribution practices are delineated (pp. 11–14); the purchase of reprints by Pfizer of Welch's sigmamycin speech (1956 symposium), and the assertion in this speech of the Pfizer advertising slogan, "third era in antibiotics" (p. 65); the functioning of the Pfizer budget with reference to advertising disbursements (pp. 71–73); and the agency which handled Pfizer's advertising (pp. 32–43).

McKeen was also asked questions about the quantity of reprints purchased by

Pfizer and the uses to which they were put. For example:

"Q. * * * does each particular department have a budget? A. Yes, sir.

Q. Is that budget made up at the beginning of the year? A. Generally, sir.

* * * * * *

A. * * * Should a new product come along in the middle of the year, there requires additional appropriation. He would then request that.

Q. From whom? A. This is the executive committee that would approve that.

Q. Who presides over the executive committee? A. I do, sir" (pp. 71–72).

Defendant Malcolm, chief executive officer of the American Cyanamid Company, testified about the prices, quantities, and types of promotional materials purchased by his company (Malcolm Tr. pp. 36, 40–42, 52–54, 60–61, 67, 70, 75, 80–102), as follows:

"Q. Will you read those notes and explain them if you know what they are? A. * * * 10,000 reprints now, right to purchase 100,000 later, 10,000 copies, 6 weeks, at $1.76 per copy. 10,000 reprints of editorial in May issue of Antibiotics and Chemotherapy * * *" (p. 36).

* * * * * *

A. That is more than the science of advertising; * * * that is also the art of distribution and servicing the physician.

Q. * * * you put an 'okay' after publishing the enclosed editorial in the July issue of the journal? A. Uh-huh.

Q. * * * the journal would send a reprint of the editorial with a cover letter to every scientific journal in the country. * * * A. Uh-huh" (pp. 52–53).

* * * * * *

Q. * * * as to policy, with reference to mailing out these reprints * * *

* * * * * *

Q. Where there is a difference of opinion between the two * * *

* * * * * *

Q. Dr. Malcolm, if there is a difference of opinion on policy, between Carey and Bogan * * *

* * * * * *

Q. Wouldn't you enter the situation at all? * * * A. That's when I would give my opinion between the two of them. * * *" (pp. 67–68).

* * * * * *

"A. Reprints published in English, 60,000?

* * * * * *

A. Lederle paid $45,200.

Q. Spanish; 40,000 copies, for which you were charged $52,300. A. Uh-huh. * * *

Q. * * * All of which total $123,500.40. A. Uh-huh" (p. 75).

Defendant Schwartz's testimony before the grand jury included a discussion of solicitation of advertising by Welch, as follows:

"Q. Now, Mr. Schwartz, in connection with a letter that you wrote Dr. Welch, on December 8, 1955, who in the Advertising Section or Division did you talk to in connection with Dr. Welch and Dr. Ibanez's letter, soliciting advertising? A. * * * I would have said I would have handed it to Mr. Mulcahey, who was then Advertising head of Bristol" (pp. 18–19).

In addition to the general marketing information which this testimony reveals, evidence of the quantities and prices of reprints and other promotional materials would be admissible at trial to determine if disbursements for these materials were justifiable expenditures or were way out of proportion as compared with similar disbursements by other companies. The functioning of advertising

budgets could be introduced in order to show the responsibility and knowledge of the individual defendants with respect to advertising expenses, and this information might reasonably lead to the discovery of witnesses who would know about the methods used for promotion and the role that the individual defendants had in this operation. Likewise, the knowledge of the identity of Pfizer's advertising agency and of the account executives might well give the government other important witnesses.

The responsibility of the defendants, within their companies, for many aspects other than advertising, was also brought out by their testimony. The Government's bill of particulars (paragraph "27"), in addition to delineating the licensing agreements which the individual defendants allegedly personally negotiated, states that each of the individual defendants has been responsible for his company's pricing policy on broad-spectrum antibiotics and concludes that

"(f) The acts done by each of the corporate defendants in furtherance of the combination and conspiracy in restraint of trade, the combination and conspiracy to monopolize and the monopolization, as alleged in the indictment and as particularized in paragraphs * * * of the bill of particulars were expressly or impliedly authorized, ordered or done by the respective individual defendants. * * * "

The defendants also testified before the grand jury of the responsibilities of others within their organization. These persons could be called by the government to testify against the defendants. McKeen discussed his personal authority with respect to advertising and promotion and mentioned the names of many subordinates and their function within the company (pp. 14, 11, 26, 71–73.)

The following extract from his testimony, illustrates the extent to which this line of interrogation was pursued:

"Q. * * * Will you tell us how these matters are submitted to you, any new drug that is being developed and finally gets to a point where your staff feels it is ready for a commercial operation. A. It goes up through the research department generally then I would hear from it from the research director, generally.

Q. Now this finally got to Doctor Carlozzi * * * now from Doctor Carlozzi it would go to whom? A. Probably go to Mr. Kane.

Q. Who is Mr. Kane and what is his business?

* * * * * * *

Q. What is the next step? A. Then the matter is reviewed.

* * * * * *

A. And discussed generally with me.

Q. Mr. Kane discusses it with you. * * *

* * * * * *

Q. Anybody else in on that conference, generally? A. * * * There could be some salespeople in on the discussion, the marketing people. In this instance, it might have been Mr. Win or Mr. Whitney * * * " (pp. 48–49).

He also testified that he had been President of Pfizer since 1949.

Malcolm's testimony is replete with references to his authority within the Cyanamid organization, the breakdown of divisions within the Cyanamid and Lederle organization and the persons responsible for them (pp. 13–24, 28). He also testified that he had been vice-president of American Cyanamid Company from 1944 until 1957, when he became president, and that from 1955 until 1957, he was in charge of marketing (pp. 19–20); that he was personally responsible—for the approval of certain articles written by Welch to encourage the adoption of the name "aureomycin" as a trademark (pp. 47–49), and for making changes in the language of this editorial (pp. 55–56); that his approval was needed for the purchase of reprints, which could not be anticipated within the budget (p. 61); that he would make

the decision about mailing out reprints if there were a difference of opinion between his subordinates (pp. 67–68); that any books purchased "would have to come by way of an appropriation over which" he "held the purse string" (p. 81); and that he would have to approve any additional money requested outside the limits of the budget (p. 86).

Schwartz testified that he became president of Bristol-Myers in 1957 but that he had been director of Bristol Laboratories since 1951 (p. 5). He stated who the contact men were for Bristol with the Division of Antibiotics (p. 16), that Dr. Charles Mann was Medical Director of Bristol Laboratories (p. 17), and that Dr. Bowman, executive vice-president of Bristol, handled solicitation of advertising (p. 17).

The individual defendants also testified about matters which reveal their knowledge of circumstances from which, if supported by other proof a conspiracy could be inferred. McKeen testified that Pfizer discovered tetracycline, sold it under the brand name tetracyn, and licensed other companies to manufacture and sell this antibiotic (p. 8); that he enunciated the policy that symposia are important and that Pfizer should take an important part in the 1956 symposium (p. 60); that he was familiar with the advertising slogan on sygamamycin referring to it or the advertising campaign as the third era in antibiotics (p. 65); that he attended the 1953 antibiotic symposium which was the "one that literally came out with tetracycline and did such a terrific job in presenting the various aspects of tetracycline" (p. 67) and the 1954 International Symposium (pp. 68–69); that he knew that Pfizer uses reprints in their advertising for distribution to physicians (pp. 74–75).

During his testimony, Malcolm testified that it was the general practice to distribute reprints to medical experts. Schwartz testified that he knew that Welch had an interest in the publications for which Welch solicited advertising (p. 13). This evidence of general knowledge on the part of the defendants could be introduced in order to show that the individual defendants were aware of the promotional practices of their companies. Testimony could also be introduced against McKeen to show that he was aware of the licensing arrangements for tetracycline and that he knew what transpired at several symposia. In addition, it could be shown that other individual defendants or co-conspirators attended these symposia from which common knowledge and purpose could be inferred.

Each of the defendants also testified about meetings he had attended with one or more of the other individual defendants or co-conspirators. McKeen testified that he attended some meetings of the American Drug Manufacturers' Association (p. 79), and that he had been a member of the executive committee of the Pharmaceutical Manufacturers' Association (p. 78). Malcolm testified that he attended meetings of the Pharmaceutical Manufacturers' Association in 1955 and 1959 (in Florida) (pp. 110–111), and an executive meeting of the American Drug Manufacturers' Association in Chicago in 1956 (p. 114). Malcolm also testified about a New York meeting in 1958 also attended by a Mr. Bowman of Bristol and a Mr. Lepart of Squibb. (The minutes of the Grand Jury read "Bogan" instead of Bowman in places.) Malcolm stated that he had been invited to this gathering by Bowman, and that besides the individuals already named there were several others who were also in the drug manufacturing business, but that he did not remember who they were. No one, he stated, was present from Pfizer. According to Malcolm, the subject of conversation was a proposal by Bowman to form an "Antibiotic Foundation", the purpose of which would be to centralize scientific advances and to evaluate new antibiotics. Welch was mentioned as the first choice to head the foundation and Malcolm was requested to ask Welch if he was interested (pp. 103–106).

Schwartz testified that in 1958 (it is not clear whether shortly before or after

the above meeting) he was invited to lunch in New York City, by Malcolm. Welch was also present at this luncheon and the discussion centered on the proposed "Antibiotic Foundation". According to Schwartz, Bowman suggested that there be another meeting to discuss the foundation and consequently, the two of them and Malcolm and Lepart of Squibb met at a New York club (pp. 7–8, 17). Schwartz also testified that he attended meetings of the American Drug Manufacturers' Association (pp. 11–12).

The Government's bill of particulars (paragraph "6") lists the acts which it claims will support "in part" the inference of agreement. All of the acts listed took place between November 1953 and December 1955. The only reference, in the grand jury minutes, to a meeting during this period is Malcolm's testimony that he attended a meeting of the Pharmaceutical Manufacturers' Association in 1955. Malcolm, however, was not involved in any of the alleged 1955 meetings listed in the Bill of Particulars. In spite of this, the simple fact remains that testimony of the meetings given during the grand jury proceedings could be used against the individual defendant who so testified. The testimony itself shows or an inference can be drawn from it that the individual defendants and co-conspirators belonged to the same business organizations, knew each other, and discussed subjects such as antibiotics which are germane to the instant indictment. In addition, however, paragraph "7" of the bill of particulars states that the written agreements are not unlawful without reference to other facts. Evidence of the meetings disclosed to the grand jury would be admissible at trial to shed light on these alleged written agreements and to show the alleged unlawful purpose they were designed to accomplish.

The proposed "Antibiotic Foundation", which was discussed during the 1958 meetings, was the subject of the defendants' testimony several times during the grand jury hearings; and the FTC proceeding commenced on July 28, 1958, was also the subject of interrogation. McKeen, during his testimony, was shown a copy of a letter, dated August 8, 1958, sent to him by Welch, in which Welch discussed the outline of the proposed "Antibiotics and Chemotherapy Foundation". Apparently, Welch, in this letter, had mentioned something about the pending FTC proceeding (p. 16 McKeen). We have not received a copy of the letter sent to Mr. McKeen, but we do have a copy of a letter from Welch to Malcolm, dated August 12, 1958 (Malcolm Grand Jury Exhibit No. 9), which reads in part:

"I am enclosing a copy (rough draft) on the 'Antibiotics and Chemotherapy Foundation'. * * * I also sent a copy of this to * * * McKeen. John was quite cool to the project when I first talked with him but he indicated considerable more interest after a thorough discussion. I think the present state of affairs with FTC may have been influential. * * *"

Following the reference to the August 8, 1958 letter, the following took place before the grand jury:

"Q. What was going on at the Federal Trade Commission at that time, Mr. McKeen, that is referred to there that makes the Foundation or the writer—the writer would think it made the Foundation a matter of interest to you? (p. 16)

* * * * * *

Q. There was something developing at the Federal Trade Commission about that time. Did Pfizer and Company have any matter pending before the Federal Trade Commission? (p. 16)

* * * * * *

A. What the exact status of the antibiotic situation was at that time * * * our company has been up before the Federal Trade Commission for price fixing and for a number of other matters in connection with the tetracycline patents. * * more recently before the Department

of Justice in almost the same matters (p. 17)

\* \* \* \* \* \*

Q. Don't go into those antitrust matters, if that's what you're getting into. \* \* \* (p. 17)

\* \* \* \* \* \*

Q. About the time of this letter, August 8, 1958, I am advised that there were some matters pertaining to antibiotics pertaining to the Federal Trade Commission. \* \* \* (p. 17)

\* \* \* \* \* \*

Q. I saw some correspondence, Mr. McKeen, that suggested that it would help on keeping matters like that which occurred on antibiotics before the Trade Commission from reoccurring. \* \* \* (p. 18)"

This relationship between the "Antibiotics Foundation" and the FTC proceedings was also mentioned during Malcolm's testimony.

"Q. Do you recall his (Welch) telling you that incident that recently happened to Pfizer and their problem with the Federal Trade Commission would be obviated by such a foundation as he was attempting to organize?" (Tr. Malcolm p. 106)

This testimony before the grand jury "furnished leads that could have uncovered evidence of the unlawful conspiracy charged in the indictment." Smith v. United States, 337 U.S. 137, at 153, 69 S.Ct. 1000, at 1008, 93 L.Ed. 1264.

Indeed, further investigation of the proposed Foundation could reveal that the proximity in time to the FTC proceeding, the fact that at least four of the five defendants in that proceeding were consulted about the Foundation, and the fact that the subject matter of the Foundation concerned the products involved before the FTC were sufficient circumstances along with other evidence from which a conspiracy, as evidenced by certain written documents (mentioned in paragraph "6" of the Government's bill of particulars), could be inferred.

During his testimony, McKeen discussed many aspects of the combination drug, sigmamycin. McKeen testified how sigmamycin was developed and made ready for introduction on the market (pp. 48–55); that sigmamycin is a synergistic drug and the advantages of synergism (p. 59); and that he was familiar with the Pfizer advertising slogan for this product (p. 65). A copy of Welch's opening remarks at the 1956 Antibiotics symposium was introduced, and McKeen paraphrased the contents of this speech for the grand jury (p. 70). The nature and effectiveness of sigmamycin would be important for the government's case, because they would be important elements to be considered the pricing of this product.

A good part of Malcolm's testimony concerned the attempts of Cyanamid to change the name "aureomycin" from a generic name to a trade name (pp. 26–57). Welch wrote an editorial in favor of this change (pp. 46 et seq.), and Cyanamid was eventually successful in acquiring this change. Once again, this testimony constitutes a circumstance from which certain attitudes of the individual defendant Malcolm can be inferred, particularly with reference to his motives, purpose, intent and knowledge.

The documentary exhibits produced before the grand jury by the defendants as individuals also contain incriminating evidence. 15 U.S.C. § 32 provides that "No person shall be prosecuted \* \* for or on account of any transaction, matter, or thing concerning which he may testify *or produce evidence, documentary or otherwise* \* \* \*" These series of letters between the defendants and Welch show that the individual defendants and other co-conspirators (such as "Jack" Powers of Pfizer) listed in the bill of particulars (paragraph 6), were more than mere business acquaintances and that there existed between them a friendly relationship which went way beyond that of ordinary business

competitors.* Thus, we find that the letter from Welch to Malcolm of August 12, 1958, was addressed to "Dear Weed" and referred to McKeen as "John".

The testimony of all three of the defendants before the District of Columbia grand jury concerned transactions, matters, and things for which they are being prosecuted on the indictment pending in this court. The same parties, the same market, and substantially the same period of time were involved in that grand jury investigation as are involved in the instant prosecution. Evidence was given of marketing practices, the personal responsibility of the individual defendants within their companies and the procedure for the development of new drugs. The testimony concerning the "Antibiotics Foundation," and of other contacts between the individual defendants would be some evidence tending to show that these defendants were working together and in concert with each other in connection with the marketing and sale of antibiotics. It is clear that much of the testimony given before the District of Columbia grand jury involved circumstances from which an element of the crimes here charged could be inferred or which might furnish leads that could have uncovered evidence of these crimes. Indeed, in oral argument before us, the Government stated several times that much of the testimony given before the District of Columbia grand jury was a "link in the chain" of evidence needed to prosecute the defendants in this court (Hearing June 2, 1965, pp. 155, 159, 160, 166).

 *We also find that the District of Columbia Grand Jury proceedings were "proceedings under" the Sherman Act.*

The letters of authorization issued to the government attorney who conducted the District of Columbia Grand Jury investigation did not limit the inquiry to possible bribery and conflicts of interest but authorized investigation of violations of "other criminal laws of the United States". The *subpoenae duces tecum* issued by the District of Columbia Grand Jury to the individual defendants here did not refer to any particular criminal statute, and many of the documents required to be produced would be relevant and material to an antitrust investigation. Correspondence between Welch and the defendants naturally involves advertising, marketing, and scientific articles, about antibiotics, and correspondence and memoranda concerning antibiotics symposia reveals defendants' knowledge about the value and attributes of various products. It is of record, in addition, that many of these documents were exhibits before the Senate Antitrust and Monopoly Subcommittee.

We have several times noted that much of the testimony given before the District of Columbia Grand Jury would be admissible in this Court on the trial of the instant indictment and clearly was privileged within the Fifth Amendment "link in the chain" test. Likewise, we have seen that immunity statutes give protection commensurate with that afforded by the Fifth Amendment. The Government contends, however, that the "link in the chain" test cannot be used to decide if an immunity statute applies to a particular proceeding. Instead, the Government urges that there has to be a "substantial relationship" between the testimony and the subject matter of the immunity provision.

It is true that many cases use the word "substantial" in defining the relationship which must exist in order for an immunity provision to apply to testimony given at a particular proceeding. In United States v. Harris, 334 F.2d 460 (2 Cir. 1964), the court held that a grand jury proceeding was within the provisions of the Communications Act im-

---

* Malcolm Exhibit 8—Letter addressed to Malcolm from Welch August 26, 1955, reading in part:
 " * * * I have heard from * * * and Jack Powers who are most interested in attempting to get their money back following our last golf match. * * * "

munity statute, because "the questions themselves revealed a substantial link with * * * sections of the Communications Act" (p. 463). In United States of America v. Tramunti (Decided April 5, 1965, 2d Cir.), 343 F.2d 548, the court stated:

"As we stated in Harris, in its investigation of a particular crime the Grand Jury may well unearth evidence of violations of other criminal provisions as well and the *immunity extends to all testimony insofar as that testimony bears a substantial relation to the subject matter of the immunity provision*" (p. 552).

It is our view, however, that the "substantial relation" test applied in these cases is really the same as the "chain in the link" test applied in the Fifth Amendment cases. In Harris (supra) the court after delineating its "substantial link" test, wrote:

"On facts quite analogous to those here presented, the Third Circuit held that the government had sufficiently established the *necessary link* of a possible violation of the Communications Act * * *. Marcus v. United States, 310 F.2d 143 (3 Cir. 1962), cert. denied, 372 U.S. 944, 83 S.Ct. 933, 9 L.Ed.2d 969 * * *" (p. 463).

Examination of the Marcus case (supra), however, shows that the Third Circuit did not employ the phrase "necessary link" in its opinion, we are led to conclude, therefore, that the court in Harris (supra) used the phrases "substantial relation" and "necessary link" interchangeably.

In Smith v. United States, supra, the Supreme Court held that the facts were links in the chain of evidence and that disclosures which "furnished leads that could have uncovered evidence" of the crime charged in the indictment tended to incriminate, and were therefore within the protection of the Fifth Amendment. After this conclusion, however, the court continued that:

"Petitioner testified concerning transactions, matters and things

*substantially* connected with parts of the conspiracy * * *" (337 U.S. p. 153, 69 S.Ct. p. 1008).

Likewise in Heike v. United States, 227 U.S. 131, 33 S.Ct. 226, 57 L.Ed. 450, in deciding that the protection afforded by an immunity statute was commensurate with that afforded by the Fifth Amendment, Mr. Justice Holmes wrote:

"When the statute speaks of testimony concerning a matter it means concerning it in a *substantial* way, just as the constitutional protection is confined to real danger, and does not extend to remote possibilities out of the ordinary course of law" (p. 143, 33 S.Ct. p. 228).

It is true that in Harris and Tramunti, the immunity acts involved applied to a wider category of proceedings than 15 U.S.C. § 32. In Harris, the immunity act was applicable to any proceeding "based upon or growing out of any alleged violation" of the Communications Act, and in Tramunti the act would apply in any case or proceeding "involving any violation" of the Narcotics Act. While the operative language of 15 U.S.C. § 32, "under" the Sherman Act is more restrictive than that used in the above mentioned statutes, the great majority of the material indicia points to, is consistent with, and leads us to a determination that the District of Columbia Grand Jury was conducted under the Sherman Act. We have found that the letters of authority, subpoenae and subject matter are consistent with this determination. Indeed, even if the grand jury testimony, which we have shown would tend to incriminate the defendants in the instant antitrust suit, were held to not be sufficient to render the grand jury proceeding "under" the antitrust laws, there was other testimony (which even though it be considered unrelated to the instant indictment) is germane to the Sherman Act. For instance, the District of Columbia Grand Jury could have indicted Welch for aiding and abetting the defendants in an alleged violation of the Sherman Act concerning the sale and marketing of

antibiotics (see Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962)).

We have heretofore noted that the Assistant Attorney, who conducted the District of Columbia grand jury proceedings has stated that the purpose of these grand jury hearings was not to elicit information relating to violations of the antitrust laws. We have no doubt in the entire sincerity of this statement. It is clear, however, that much of the testimony before the grand jury could have been used in antitrust prosecutions and that the grand jury hearings were "under" the antitrust laws because of the testimony elicited and the line of interrogation at times pursued. We accept and apply the sound principle that " * * * the intentions of the prosecutor cannot be the test for the applicability of an immunity provision" (United States v. Niarchos, 125 F.Supp. 214, 224 (D.D.C.1954)).

The motion of the three individual defendants to dismiss the indictment returned and pending in this district is granted and the indictment is dismissed as to them and each of them. So ordered.